**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-00062-JEB** |
| **v.** | : | |
| | : | |
| **THOMAS BARANYI,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the Government requests that this Court sentence Thomas Baranyi ("Baranyi") to four months' incarceration, one-year supervised release, 60 hours of community service, and $500 in restitution.

I.      **Introduction**

The defendant, Thomas Baranyi, a 30-year-old fitness center clerk, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forcibly interrupted the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

Baranyi pled guilty to one count of violating 18 U.S.C. § 1752(a)(1): Entering and Remaining in a Restricted Building or Grounds.  Baranyi's actions on January 6 took place in the

---

[1]      As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

context of a large and violent riot in which sheer numbers combined with violence to overwhelm law enforcement, allowing rioters to breach the Capitol and disrupt the proceedings. The riot would not have happened without people like Baranyi who chose to join with so many others to overwhelm law enforcement and breach the building.  Unfortunately, the attack by rioters harmed law enforcement officers and led to the death of a rioter, a harsh reality evident in Mr. Baranyi's case.

A custodial sentence of four months incarceration, to be followed by one year of supervised release is warranted in this case because Baranyi:  1)  supported the attack at the United States Capitol building, passing through barriers erected by the United States Capitol Police bearing "Keep Out" signs, then joined hundreds of other rioters who entered the restricted Capitol grounds with overwhelming numbers and force; 2) entered the Capitol building through sounding alarms at the Senate Wing Door; 3) moved to the Crypt and joined other rioters as they violently pushed past a police line trying to stop the advance of rioters; 4) passed through teargas to move throughout the Capitol building; 5) made his way to the door of the House of Representatives Chamber, and when he and other rioters could not enter, moved with the mob through hallways to the Speaker's Lobby; 6) watched from close proximity as other rioters smashed open windows just over the shoulders of officers trying to guard the House Chamber against attack; and 7) was standing within feet of Ashli Babbitt when she was fatally shot by an officer of the United States Capitol Police Department as she tried to climb through a broken window and into the occupied House Chamber.

After witnessing the death of Ms. Babbitt, 8) Baranyi left the Capitol building and gave interviews calling for the overthrow of the Government, saying "this is not a government we can allow to stay, take it down" and "this is beyond talk!  It's not talk anymore!;" and 9) in text

messages sent days after January 6, 2021, Baranyi remained defiant about his conduct on January 6, 2021, and made plans to return to Washington, D.C. to protest the Presidential transfer of power. Those plans were cut off by FBI agents who arrested him before the inauguration.

## II.     Factual and Procedural Background

### *The January 6, 2021, Attack on the Capitol*

To avoid exposition, the United States refers to the general summary of the attack on the Capitol.  *See* ECF 45 pp. 1-3 (Statement of Offense). As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Baranyi's conduct and behavior on January 6.

### *Attempted Breach of the Capitol Building and Assaultive Conduct*
### *on the West Front of the Capitol Grounds*

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent, smaller groups and individuals within the crowd used the mob itself as a cloak for their actions.  Their collective blows helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk.  The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 (above) as "1st Police Barricade," circled in red and marked as Area A. At 12:52 pm, the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the

restricted area to engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob. By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1. They flooded the area labeled "Lower West Plaza," Area C on Government's Exhibit 1, pushing against the barricade there.



*Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left) and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and

reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.





*Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).  In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.  At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.  It began with two blaring tones, and then a 30-second announcement, which was played loudly on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately.  This order may subject you to arrest
> and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.  On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.  Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.  By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.





*Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and*

*many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### *Baranyi's Role in the January 6, 2021, Attack on the Capitol*

Between December 12 and December 25, 2020, Baranyi texted other persons, saying, *inter alia*:

- "They [politicians] have to be removed.  By force.  That's the only way."

- "Bludgeon thru them to get to the Government that's the only way left."

- "Let's hope jan 6 they do the right thing and object."

*See* ECF 45 p. 3 (Statement of Offense, admitting the same).  Then, on the morning of January 6, 2021, he sent the same individual a text message stating, "I'm so happy man I'm finally going to be a part of it and not just talking about it."  *Id.*

Baranyi traveled with another person from New Jersey to Washington, D.C. to attend a rally protesting the election results on January 6, 2021.[2]  After driving to D.C., Baranyi took the Metro, arriving downtown around noon.  Baranyi then walked past the Washington Monument and approached the Capitol building from the west side.  Video, recorded by Baranyi on his cell phone, shows Baranyi marching with a large crowd of protestors who were chanting "Stop the Steal."  Eventually, Baranyi got to the closed area on the west side of the Capitol building and an open-source YouTube video captured Baranyi just inside the "AREA CLOSED" signs mounted on gates near the Peace Monument:[3]

---

[2]    The FBI investigation has shown that this other individual got separated from Baranyi and did not enter the Capitol.

[3]    This is an open-source video that can be found at News2Share, "Ali Alexander and Alex Jones lead march from Trump Speech to Capitol ahead of MAGA insurgency," YouTube, Jan. 8, 2021:  https://www.youtube.com/watch?v=RFpW6WNbY3c&t=288 at 4:49.



*Exhibit 5*

Video and images recovered from Baranyi's cell phone confirms that the individual within the image above was Baranyi because Baranyi took photos and video with his cell phone at this same location, including this image:



*Exhibit 6*

In a video that Baranyi took from the base of the Peace Monument, the "AREA CLOSED" signs are observable from the back, shown in circles below:



*Exhibit 7*

The crowd was chanting "drain the swamp" in two of Baranyi's videos taken at this location.

Baranyi's videos show that he later moved forward, past the layers of fencing that surrounded the Capitol building, and gathered with a large crowd near the electoral scaffolding:



*Exhibit 8*

His videos show that tear gas had been deployed in front of the crowd and shows the crowd collectively chanting "Bullshit!"  Later, Baranyi recorded himself moving up the west side Capitol steps, past toppled barricades, one circled below, while rioters yelled "whose house, our house":



*Exhibit 9*

Baranyi then recorded his approach to the Senate Wing Door, where he entered the Capitol building.  His video shows that he and others were shouting "U.S.A." just before he entered the door into sounding alarms that can be heard at the end of his video:



*Exhibit 10*

Capitol security video shows that Baranyi entered the Capitol through the Senate Wing Door at 2:23:22 p.m., approximately ten minutes after it was first breached by rioters who had kicked through the two flanking windows and the door:



*Exhibit 11*

Baranyi turned down a hallway and moved into the Crypt with over one hundred other rioters.

Capitol Police, concerned that rioters could move from the multiple exits in the Crypt to throughout the building, faced-off with rioters inside the Crypt.  As they did so, Baranyi was captured on the fish-eye security camera entering the Crypt and joining other rioters:



*Exhibit 12*

Baranyi recorded a video from within the Crypt, showing the chaos as rioters shouted, "Our House!"  Submitted Exhibit A.  Eventually police lost the struggle when rioters assaulted and pushed past Capitol Police Officers.  *See* The New York Times, "Day of Rage," YouTube, July 1, 2021: https://youtu.be/jWJVMoe7OY0?t=1292 at 21:32 - 22:16; Submitted Exhibit D at 14:25 – 22:00 (recording the confrontation within the Crypt.)  Baranyi has not been observed to have physically engaged Capitol Police inside the Crypt.  However, his presence there during the confrontations with other rioters added to the chaos and made it harder for officers to maintain

control and security within the Capitol building.  And after police lost control, Baranyi moved forward with other rioters and was observed to be rhythmically chanting.

Capitol security video shows that as Baranyi and other rioters began to exit the Crypt, Capitol police deployed tear gas in front of the crowd.  Initially, rioters retreated and covered their faces to avoid the tear gas.  But Baranyi and other rioters quickly recovered, moved forward, and ascended a stairway.  An open-source video captured Baranyi, for a brief moment in the midst of this chaos, dressed in his blue Giants sweatshirt and wearing his dark blue "Trump" hat backward, moving towards a stairway despite the tear gas in the air:



Submitted Exhibit B, 0:00 – 1:00 (with Baranyi passing the camera at 00:50.)[4]

Baranyi took a stairway up one level, where he was captured by a security camera taking photos or video as he passed through Statuary Hall and heading in the direction of the House Chamber:

---

[4]       The playback speed may need to be reduced to see Baranyi pass the camera.



*Exhibit 13*

After crossing Statuary Hall, Baranyi walked into another Capitol police line, with officers blocking rioters from getting to the main door of the House Chamber:



Submitted  Exhibit C at 56:04.

An open-source video recorded some of the events at this police line outside the House Chamber door.  Exhibit C.  In the video, a woman is observed yelling at police who stood in

16

front of the House Chamber door, "Tell Pelosi that we are coming for that bitch!  Tell fucking

Pelosi we're coming for her!" while other members of the crowd shouted "traitors" and

eventually began a chant of "we want Trump!"  Submitted Exhibit C at 56:03–57:45.  Capitol

Police Officers tried to pacify the crowd over several minutes while Baranyi watched from his

location near a statue:



Submitted Exhibit C at 56:00 – 1:03:10 (with Baranyi observable several times at around

1:00:00).  Eventually the crowd got angry and pushed Capitol Police back, overrunning them to

the House Chamber door:



17

Submitted Exhibit C at 1:03:14 - 1:03:45.

Baranyi moved forward with other rioters to the House Chamber Door and rioters began a "stop the steal" chant.  Submitted Exhibit C at 1:03:50 – 1:04:08.  Indeed, Baranyi recorded 15 seconds of this chant on his cell phone.  In the meantime, members of Congress, their staff, and law enforcement had barricaded the interior of this door for their protection:



Baranyi was just outside the House Chamber Door with only a couple dozen rioters in front of him:



Submitted Exhibit C at 1:04:49.  Angry and pushing rioters proposed using a crowbar, knife, helmet, or Kevlar vest to breach the door and chanted rounds of "our house," "stop the steal," and "break it down"  Submitted Exhibit C at 1:05– 1:09.

Another open-source video also recorded rioters at the House Chamber door.  Exhibit D beginning at 35:00.  This video shows that after several minutes of trying to get through the main door, rioters, including Baranyi, suddenly left the door and began to run down a hallway flanking the House Chamber, heading in the direction of the Speaker's Lobby:



Submitted Exhibit D at 36:05-36:20.  Rioters are observed striking ad violently kicking House Chamber doors as they pass them:



Submitted Exhibit C at 1:09:13 and 1:09:45-1:10:00; Exhibit D at 36:20-37:00.

The event that occurred next was one of the many tragic results caused by rioters on January 6, 2021, and Baranyi was there and part of the mob when it happened.  Rioters approached the Speaker's Lobby Door to the occupied House Chamber, protected by three officers.  One was covered in pepper-spray residue.  Rioters smashed the windows on the Speaker's Lobby Door, over the top and around these officers, while the mob shouted, "open the door," "stop the steal," "break it down" and general obscenities at the officers:







*See* Jon Swaine, Dalton Bennett, Joyce Lee and Meg Kelly, *Video shows fatal shooting of Ashli Babbitt in the Capitol*, WASHINGTON POST, January 8, 2021,

https://www.washingtonpost.com/investigations /2021/01/08/ ashli-babbitt-shooting-video-capitol/; Submitted Exhibit C at 1:10:35-1:10:45; Submitted Exhibit D at 37:20-38:00.  When this occurred, numerous Members of Congress and their staff were sheltering in the gallery of the Chamber, fearful for their lives, on the other side of the door.  *Id.; see also* Mary Clare Jalonick, *'We were trapped': Trauma of Jan. 6 lingers for lawmakers*, AP News, January 5, 2022,

https://apnews.com/article/jan-6-capitol-siege-lawmakers-trauma-04e29724aa6017180259385642c 1b990.

Rioters, including Ashli Babbitt, chaotically screamed at officers, telling them to get out of the way so they could enter the House Chamber.  When the officers remained unmoved and silent in the face of the mob, a rioter began to repeatedly shout "fuck the blue!":



Submitted Exhibit C at 1:10:40 – 1:11:30 (circling Ashli Babbitt).  Shortly thereafter, the three

Capitol Police Officers stepped away from the Speaker's Lobby Door when officers wearing

tactical gear came up an adjacent stairway towards the Speaker's Lobby Door.  Submitted

Exhibit C at 1:11:30 – 1:11:37; Submitted Exhibit D at 38:20 – 39:05.

As soon as the three Capitol Police Officers moved from the doorway, the rioter

recording Exhibit C shouted, "let's go – get this shit!" and other rioters moved forward and

began to violently break windows with kicks, flagpoles, and a helmet, completely knocking out

several windows:



Submitted Exhibit C at 1:11:32 – 1:11:53; Submitted Exhibit D at 38:49 - 39:09.  As rioters

broke out the windows, Baranyi stood just behind them:



Submitted Exhibit D at 38:52-38:54.

As rioters kicked the doors and broke out windows, the rioter recording Exhibit C

observed that a Capitol Police Officer had drawn his firearm on the other side of the door and

was pointing it in the direction of the open windows.  The recorder began to scream "there's a

gun, there's a gun!":



Submitted Exhibit C at 1:11:51 – 1:12:09 (also showing that furniture had been moved in front of the doors in an attempt to protect Congress from rioters).  During this violent chaos, Baranyi moved forward to the doorway and put a palm up, and began nodding:



Submitted Exhibit E at 00:00 – 00:23. Immediately after doing this, Ashli Babbitt climbed up into a broken window on the Speaker's Lobby door and was fatally shot by a Capitol Police Officer before she made it into the Chamber:



Submitted Exhibit E at 00:23 – 00:26 (identifying Baranyi with a green arrow and Babbitt with a red arrow); Submitted Exhibit C at 1:12:07 – 1:12:11; Exhibit D at 39:08 – 39:15.  Babbitt fell backward and onto the floor, and Barany (green arrow) and a Capitol Police Officer (blue arrow) bent over to help her:



Submitted Exhibit E at 00:27 – 00:30.  Baranyi backed away as people moved in to render first-aid to Babbitt, who remained lying on the floor.  *Id.*  Baranyi then recorded a video of Babbitt with his cell phone:



Submitted Exhibit D at 39:33 – 39:37.  Chaos ensued as rioters and police screamed at each other after the shooting.

Several minutes after the shooting, a group of more than two dozen Metropolitan Police Officers entered the Capitol building, moved to the Speaker's Lobby, and began an organized push of rioters out of the building.  Body worn cameras show that some rioters resisted, swearing at officers, and physically resisting the effort to push them out of the building.  The Government has not uncovered any videos showing that Baranyi resisted the police at that point.  He walked out of the building through the Rotunda Door at 2:56:38 pm, having spent just over 33 minutes inside the Capitol building.

A video, posted to Twitter,[5] captured rioters, including Baranyi, coming out of the Capitol Building.  The individual making the video began to question rioters about whether someone had been shot in the building:



---

[5]      This video can be found at Dan Cohen, Twitter, Jan. 6, 2021, https://twitter.com/dancohen3000/status/1346915317407244298?s=20&t=aKaSxY-a0Pck48-5r1zbIA

Dan Cohen, Twitter at 01:14.  While one rioter explained that he "watched her get shot," Baranyi searched his phone and said, "I got the fucking video!"  *Id.* at 01:19 - 01:28.  When the interviewer and others pushed Baranyi to share the video and to show the blood that Baranyi had on his hand, Baranyi started screaming "she fell back on my hands! Watch and don't forget! She is fucking dead because of these people!"  *Id.* at 01:50 - 02:05.  Baranyi then began to descend the Capitol steps and scream, "they killed her!  They shot her and killed her!":



*Id.* at 02:05 – 02:20.

Another video overlaps with the end of this Twitter video and captured Baranyi talking to the crowd as he descended the steps.  Baranyi said:

> We were crawling through the window in there.  We smashed the window out – we were crawling through the window and they shot her in the neck.  The police, the Service, whatever they are – they shot her with a gun through the neck and she fell back into my hands and onto the floor.  I don't know if she is dead.

Submitted Exhibit F at 13:00 – 13:20.  Then while showing the blood on his hand, Baranyi screamed, "This is beyond talk!  It's not talk anymore!":



Submitted Exhibit F at 13:24 – 13:30.

Later, after Baranyi descended the Capitol steps, he was interviewed by a reporter for

WUSA, a local TV station in Washington D.C.:



Submitted Exhibit G.  When asked how he got blood on his hand, Baranyi said:

We had stormed into the chambers inside and there was a young lady who rushed through the windows.  A number of police and Secret Service were saying "get back, get down – get out of the way."  She didn't heed the call and as we kinda raced up to grab people and pull them back, they shot her in the neck and she fell back on me.

Submitted Exhibit G at 00:00 – 00:27.  When the reporter asked Baranyi how he got out of the building, Baranyi responded, "riot police came in and started ushering us out with their sticks and stuff."  Submitted Exhibit G at 00:35 – 00:42.  The reporter then asked Baranyi where he entered the building, and where he exited the building, and Baranyi said:

other side with the scaffolding – we tore through the scaffolding through flash bangs and tear gas, and blitzed our way in through all the chambers, just trying to get into Congress or whoever we could get into and tell them that we need some kind of investigation into this.  And what ends up happening, is someone might have ended up dead.  And that's not the kind of Government that we can have – people have to do something about it [unintelligible].

Submitted Exhibit G at 00:42 – 01:06.  The reporter asked Baranyi if he needed medical treatment and Baranyi responded:  "I am not injured, I was - it could have been me but **she went in first**. It was one of us."  Submitted Exhibit G at 01:06 – 01:15 (emphasis added).  Baranyi then added:

Just make sure people know because this – this cannot stand anymore.  This is wrong.  They don't represent anyone.  Not Republican, Democrat, Independent, nobody.  And now they'll just - kill people.

Submitted Exhibit G at 01:15 – 01:28.  When the reporter asked, "who are you saying will kill people," Baranyi cited "police" and "Congress," and said that people thought he and other demonstrators were a "joke" and had been "laughing" at them as they marched earlier that day.  Baranyi added, "It was a joke to them until we got inside and then all of the sudden guns came out.  But I mean, we're at a point now it can't be allowed to stand.  We have to do something."  Submitted Exhibit G at 01:28 – 01:56.  Baranyi then showed his blood-stained hand to the camera and said, "people have to do something because this could be you or your kids!":



Submitted Exhibit G at 01:56 – 2:00.  Baranyi walked away from the reporter.

### *Baranyi's Arrest and Search of his Cell Phone*

In the days after January 6, 2021, Baranyi's statements were shared on social media and the FBI, as a consequence, received numerous tips about Baranyi.  On January 9, 2021, FBI agents spoke to Baranyi and asked him if he had any information about the shooting of Ashli Babbitt.  Baranyi explained that he did have information and stated he was next to her when she was shot.  Baranyi then requested a lawyer.

Baranyi was arrested in New Jersey pursuant to a federal warrant on January 12, 2021.  ECF 6 p. 1.  Agents seized Baranyi's cell phone and conducted a warranted search of the phone.  Baranyi took 11 photos and 23 videos on January 6, 2021, including video and photos from within the Capitol building.  His videos included a recording of Ashli Babbitt lying on the floor just after she was shot.

The examination of Baranyi's cell phone revealed text messages sent before the riot.  In one, Baranyi stated he wanted to "Bludgeon thru them to get to the government that's the only way left."  ECF 45 p. 3 (Statement of Offense).

The phone also contained text messages Baranyi sent after the riot. In one series of messages sent between January 8 and 10, 2021, Baranyi discussed the shooting of Ashli Babbitt and explained that he stepped forward to grab her before she got shot – an action not readily apparent in the video.  Baranyi later added "I think we r legit on the cusp of a civil war situation. I don't say that lightly knowing my phone is probably being watched.  But this is gonna make everyone feel like they're out for blood after the 6th."

In a text exchange with another individual on January 12, 2021, Baranyi said that "[f]ree speech is looking lost.  This whole thing is not going to end well," and later said, "Breonna taylor shot and killed in bed.  No knock warrant.  Congress got their own no knock warrant and they didn't like it."   He also stated the following about his future following Babbitt's death:

Baranyi:      It's not about right or left to me, it's about right and wrong

Individual:   Just don't ghost me

Baranyi:      It may come to that.  Literally.  It could have a few days ago when I was there.  Me or her.  I failed to act.  I won't ever waiver on convictions again.  Not after that.  She gave up the ultimate.

On January 11, 2021, Baranyi received a text message from another individual who told Baranyi he was going to Washington D.C. on January 20, 2021, to protest the inauguration of the President Elect.[6]  He told Baranyi "you're going."  Baranyi replied "Hahaha alright I'm game.  I

---

[6]      Rumors of mass protesting on January 20, 2021, were spreading, but the crowd that eventually assembled was relatively small.  *See* NPR, "No Large Protest in D.C. as President Biden is Inaugurated," January 20, 2021, at https://www.npr.org/sections/ inauguration-day-live-updates/2021/01/20/958739876/no-large-protests-in-d-c-on-morning-of-bidens-inauguration.

think this time I'll take the vest," contextually referring to a ballistic vest because the men had been speaking about "plates" and "body armor" in messages sent earlier in their thread.

### *The Charges and Plea Agreement*

On January 10, 2021, Baranyi was charged by Complaint with violating 18 U.S.C. §§ 1752(a)(1), (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF 1.  On February 2, 2021, Baranyi was charged by Information with the same crimes.  ECF 11.  One year later, on February 3, 2022, Baranyi pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds. ECF 44. By plea agreement, Baranyi agreed to pay $500 in restitution to the Architect of the Capitol. ECF 44 p. 8.

### III.    Statutory Penalties

Baranyi now faces sentencing on a single count of violating 18 U.S.C. § 1752(a)(1).  As noted by the plea agreement and U.S. Probation, Baranyi faces up to one year of imprisonment and a fine of up to $100,000.  ECF 47 p. 1.  Baranyi must also pay $500 restitution under the terms of his plea agreement. ECF Nos. 44 p. 8, 47 p. 15; 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of

individual sentencing decisions" and are the "starting point and the initial benchmark" for

sentencing. *Id.* at 49.

The Sentencing Guidelines calculation set forth in the PSR mirror those stipulated to by

the parties in the plea agreement:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A) | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* ECF Nos. 44 pp. 2-3; 47 p. 7.

The U.S. Probation Office calculated Baranyi's criminal history as a Category I, which is

not disputed.  ECF 47 p. 8.  Accordingly, the U.S. Probation Office calculated Baranyi's total

adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment

range at 0-6 months. ECF 47 p. 8.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens

of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v.

United States*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has

"'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding

inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United

States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).  In so doing, the Commission "has the

capacity courts lack to 'base its determinations on empirical data and national experience, guided

by professional staff with appropriate expertise,'" and "to formulate and constantly refine

national sentencing standards." *Kimbrough*, 552 U.S. at 108.  Accordingly, courts must give

"respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original).  In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.  As this Court knows, the Government has charged a considerable number of persons with crimes based on the January 6 riot.  This includes hundreds of felonies and misdemeanors that will be subjected to Guideline's analysis.  In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this Class A misdemeanor case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration and supervised release.

### A.  The Nature and Circumstances of the Offense

The attack on the Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only a handful of times in our history when the building was literally occupied by forces hostile to the Government.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  This case amply demonstrates the danger posed to the police, Congress, and even rioters that day.

Additionally, while looking at Baranyi's individual conduct, this Court should consider a spectrum of aggravating and mitigating  factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence;

(6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this offense were deadly.  Baranyi's text messages before January 6, 2021, expressed violent rhetoric, with Baranyi saying that politicians needed to be removed "by force" and he must "bludgeon thru them to get to the government that's the only way left."  Baranyi entered the restricted Capitol grounds with "AREA CLOSED" signs around him. He moved further into the closed area, to the walls and steps of the Capitol building even though Capitol Police had to use teargas to disperse the crowd. Although the Government has not uncovered video evidence of all of Baranyi's movements on the west side of the Capitol, Baranyi told the WUSA reporter that he "tore through the scaffolding through flash bangs and tear gas and blitzed our way in through all the chambers."  This is completely consistent with what happened on the west side.[7]

Baranyi walked up the Capitol steps, past fallen barriers, and entered the Capitol. Baranyi went into the Crypt and watched rioters overcome police and push them aside.  He continued through the building, through tear gas deployments and made his way to the House Chamber door. He watched rioters forcefully push aside police there and moved to the literal doors of Congress

---

[7]     *See* Submitted Exhibit C at 20:30 – 41:00 (showing the environment at the time that Baranyi approached the Capitol building from the same side, later joining the same crowd as the videographer); Submitted Exhibit D at 5:00 – 12:00 (same); Glenn Hudson, "Stop the Steal Protest Washington D.C," YouTube, January 8, 2021, https://youtu.be/MrW1bD9laoU?t=217 at 3:37 – 8:15 (showing repeated tear gas deployments, the crowd shouting obscenities at police, and rioters tearing the electoral scaffolding.)

where rioters began chants showing that they were trying to stop the certification of the Electoral College vote.

When rioters, including Baranyi could not enter the House of Representatives through the main House Chamber door, he joined other rioters and moved to the Speaker's Lobby door where rioters violently moved for entry.  On the way, Baranyi saw and heard rioters kicking and striking the doors to the House Chamber, as shown in video.  Baranyi stood directly behind rioters who threatened officers and smashed out the windows on the Speaker's Lobby Door, while trying to get into the House Chamber.

Baranyi was present when a Capitol Police Officer drew his firearm to protect Members of Congress and staffers at the Speaker's Lobby Door.  Rioters were violent and the group was completely beyond law enforcement efforts to stop them.  When Ashli Babbitt jumped into the window, with Congress on the other side, she was shot to prevent her and other rioters from reaching all of those behind the door.  Thus, all the rioters who were there with Baranyi - who broke multiple police lines and moved forward into the Capitol building anyway, who escalated the situation by their chants, presence, and increasingly brazen calls for violence, who supported the most violent as they kicked, screamed, and threatened police and smashed windows – they are culpable in Babbitt's death.  Because of their numbers, and their complete disregard for law enforcement efforts to stop them, rioters had escalated to the point where someone was shot.

Baranyi's statements immediately following the shooting were extremely aggravating. Baranyi waved his bloody hand to the riotous crowd and blamed the U.S. Capitol Police Officers, who had been exercising considerable restraint and acting bravely to protect everyone.  Baranyi screamed "this is beyond talk anymore" and threw additional gasoline on the fire by stating, "it

can't be allowed to stand" and arguing that the Government might shoot their "children" next. This conduct is extraordinarily outrageous and dangerous.

Unfortunately, the passage of time did not appear to give Baranyi any reasonable understanding of what he did.  In text messages, he vowed that he would not "fail to act" in the future," believed there could be a "civil war" and made plans to return to Washington, D.C. wearing body armor.[8]  These sentiments are dangerous and disturbing.

Baranyi did not express any remorse in his PSR interview, choosing to say nothing more than admit the elements of the offense and accept the factual summary in the Statement of Offense. ECF 47 p. 7.  Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration and lengthy supervision.

### B.  Baranyi's History and Characteristics

As set forth in the PSR, Baranyi has no criminal history, has a bachelor's degree, and, worked for the U.S. Peace Corps.  ECF 47 pp. 8, 10  Baranyi has never been married and has no children. ECF 37 p. 8-9.  Baranyi appears to have been compliant with his conditions of pre-trial release.  ECF 43; 47 p. 4.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

This case shows that Baranyi lacks respect for the law. On January 6, 2021, he entered the closed area around the Capitol building and ignored efforts to stop his entry.  Baranyi ignored alarms, tear gas, and police lines and made his way to the doors of Congress.  The mob that Baranyi joined acted violently and escalated to the point that a rioter was shot. After witnessing this shooting, Mr. Baranyi called for people to fight the Government and police, not comply with them.

---

[8]      In text messages sent after the Capitol riot, Baranyi said that he had not shot a gun before, and Baranyi does not appear to own firearms.

Again – statements made by Baranyi after the incident in text messages, heighten the Government's concern.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6th was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have

recognized, democracy requires the cooperation of the citizenry.  Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of Government into disarray, and it undermines the stability of our society.  Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The Government acknowledges that Baranyi accepted responsibility by entering into this plea agreement.  On the other hand, Baranyi's statements after leaving the Capitol building and his relevant statements after January 6 show that he then believed that a civil war could be imminent and supported an ongoing fight against the Government.  He discusses body armor and vowed not to back down in the future.  There is a clear need for specific deterrence in the form of a custodial sentence and monitoring after the sentence is complete.  Specific deterrence supports the proposed sentence and nothing less.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the Government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere

with Congress.[9]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, particularly those with the aggravating circumstances in this case, were not minor crimes. A probationary sentence should not become the default.[10]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but

---

[9]     Attached to this memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[10]     Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The Government is abiding by its agreements in those cases but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the Government). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of the legislative branch of federal Government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and the large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentence imposed in another defendant sentenced under 18 U.S.C. § 1752(a)(1), *Blake Reed*, 21-cr-208-BAH. The Government requested three months' incarceration for Reed to be followed by twelve months

supervised release.  21-cr-205-BAH, ECF 171.  Like Baranyi, Reed sent messages about violence and rebellion before January 6, 2021, and took video as he marched towards the Capitol building.  Like Baranyi, Reed was exposed to chemical irritants and fought his way with the crowd to make his way to the Senate Wing Door, where Baranyi also entered.  Like Baranyi, Reed made his way through the Crypt, and also made his way to the House Chamber door.  However, Baranyi remained in the Capitol building longer, 33 minutes, as opposed to the 20 minutes spent by Reed.  Also, Reed did not make his way to the Speaker's Lobby door and watch rioters violently break out windows and witness the shooting of a rioter.  Although Reed was shown to concoct a fake defense, Reed did not do what Baranyi did – give statements advocating for the overthrow of the Government.  Reed was sentenced to 42 days intermittent confinement and 3 years' probation.

In addition, the Court should also consider the sentences imposed on other January 6th defendants who, like Baranyi, pleaded guilty to violating 18 U.S.C. § 1752(a)(1) and engaged in similar conduct. *See United States v. Schornak*, 21-cr-278-BAH (sentenced to 28 days incarceration; aggravating factors included preparing for the riot, witnessing violence against law enforcement, making social media posts, asking others to delete their social media, and lack of remorse); *United States v. Tryon*, 21-cr-420-RBW (sentenced to 50 days incarceration; aggravating factors included defying law enforcement commands, witnessing property destruction and proclaiming an intent to interfere with the certification vote); *United States v. Bonet*, 21-cr-121-EJS (sentenced to 3 months incarceration; aggravating factors included entering the Capitol, posting on social media, and making inflammatory statements).  Baranyi's case is more serious – persisting with a violent crowd of rioters that fought their way close to

Members of Congress and their staff, and because Baranyi wanted to return with body armor after witnessing a rioter get shot.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the Government recommends that this Court sentence Thomas Baranyi to four months' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      */s/ Michael W. Mitchell*
MICHAEL W. MITCHELL
Assistant United States Attorney
Detailed to the District of Columbia
Texas Bar No.  24037126
555 4th Street, N.W.
Washington, D.C. 20530

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the forgoing motion was served upon counsel of record through ECF on the date of filing, this the 10th day of June, 2022.

By:     /s/ *Michael W. Mitchell*
MICHAEL W. MITCHELL
Assistant United States Attorney
Detailed to the District of Columbia
Texas Bar No.  24037126
555 4th Street, N.W.
Washington, D.C. 20530