**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | **Crim. No.  21-62 (JEB)** |
| | **)** | |
| **v.** | **)** | |
| | **)** | |
| **THOMAS BARANYI** | **)** | |
| | **)** | |
| | **)** | |

---

## <u>MEMORANDUM IN AID OF SENTENCING</u>

"[W]e are threatened with suffering from three directions: from our body, which is
doomed to decay..., from the external world which may rage against us with
overwhelming and merciless force of destruction, and finally from our relations with
other men... The suffering which comes from this last source is perhaps more
painful to us than any other."

— Sigmund Freud, Civilization and Its Discontents

1

*"It's unfortunate the police and Secret Service didn't have an extra bullet with your name on it."*

*Threatening Letter sent to Thomas Baranyi in February 2022*

On a brisk late afternoon around February 16, 2022, Thomas Baranyi headed home after work.  There was nothing unusual about that day.  It had been two weeks since he pled guilty to a misdemeanor offense for Entering and Remaining in a Restricted Building Grounds.  It had been over a year since January 6th.  It had been a very long 13 months.  Images of seeing Ashli Babbitt shot still played in his mind.  All these months later, he can still see her blood on his right hand.  He received questioning looks and evil stares from that day.  By February 2022 though, much of the images and stares were subsiding.  He was starting to live a "normal" life with a quiet routine – early to work, take classes, volunteer, and back home before dark.  No encounters and no drama from anyone.  Thoughts of January 6th and his remorse kept him company, as well as the occasional dinner with his mother and stepdad.

That was until he received a letter in the mail to his home address.  It had no return address.  There were other evil things written in the letter, but that phrase "an extra bullet with your name on it" triggered the events all over again for Mr. Baranyi.  He was right next to Ms. Babbitt when she was shot.  Immediately before that, he raced up to pull people back after hearing the police say "get down" and "get back."  He saw the gun and placed his left hand up to door hoping that would

2

indicate to the officer that they surrendered and he did not have to shoot.  But he did.

Mr. Baranyi did not know Ms. Babbitt.  He did not notice her before their paths crossed at that fateful moment.  He quickly tried to help her.  When the officers directed him, he stepped back and he pulled out his phone quickly to capture the unbelievable moment.  He was unsure if she was still alive.  At that moment, he knew his individual quest to lend his voice to what he viewed were government failures were over.  His mind shut out the trauma he just witnessed and he proceeded calmly out of the Capitol building.  He encouraged others to do the same.

When the fresh air of the outdoors hit him, the calm that covered his mind floated away.  Anger and fear from what he witnessed took over.  Her blood was still on his hands.  He held it up for everyone to see.  Was he wrong for being there?  Yes.  Should she have died that day?  No, no one should have died that day.  He instantly gave a witness account to a reporter with his mind still processing the fear he felt – "We were crawling through the window in there. We smashed the window out – we were crawling through the window…"  It was clear from the video footage that he did not crawl through or smash the window.

Then, outrage poured out.  "[P]eople have to do something because this could be you or your kids!"  The outrage and fear did not subside in the days to come.  When asked whether he would come to D.C. for the inauguration, he stated he would come with a vest.  However, he had no plans to return to D.C.

Mr. Baranyi was one of thousands of people who came to the Capitol that day, one who believed a falsehood advertised to millions – that former Vice President Mike Pence had the power to overturn the fraudulent election. He believed it was his civic duty to travel to Washington, D.C., to "Stop the Steal." Throughout the Capitol, he lent his voice to an important cause, which he only learned later was an imprudent one – Pence had no authority to overturn the election. In the days after, he still believed that an injustice had taken place – that the government failed him and millions of Trump voters. And for him particularly, he witnessed an unjust death by the hands of a government official. His left hand was up in an effort to surrender and his right hand had the blood of the woman who died. It would be challenging for anyone to move past.

Post-traumatic stress disorder "is a whole-body tragedy, an integral human event of enormous proportions with massive repercussions."[1] The broken glass, the gun shot, and the sound of a body hitting the floor still reverberate in Mr. Baranyi's mind more than a year later. The day is difficult for him to discuss, but he is remorseful. He was not part of a militia group seeking to overthrow the government. He did not encourage violence. He lent his voice for an unfortunate cause which resulted in unfortunate consequences. He has been traumatized ever since. For these reasons, no incarceration should be imposed. Based on the nature and circumstances of the offense, his background, acceptance of responsibility, and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense

---

[1]     Susan Pease Banitt.

respectfully requests a sentence of probation and home detention, which would be a sentence not greater than necessary to address his conduct in this unique case.

## TIMELINE OF JANUARY 6th EVENTS

The timeline of January 6th is well-known.  Approximately 30,000 people were expected to attend.[2]  Around 6 a.m that day, numerous Trump supporters headed towards the rally at the Ellipse and "[m]any began gathering the night before."[3]  The vitriol and antagonistic speech spread over the crowd of thousands. Prominent Trump supporters encouraged the crowd to march to the Ellipse and fight:

| | |
|---|---|
| **11 a.m.** | High-profile figures of the Republican Party spoke directing the Trump supporters: |

- Representative Mo Brooks (R-Ala.) urged "American patriots" to "**start taking down names and kicking ass**."[4]
- Katrina Pierson stated, "Americans will stand up for themselves and protect their rights, and they will

---

[2] Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

[3] George Petras, Janet Loehrke, Ramon Padilla, Javier Zarracina and Jennifer Borresen, *Timeline: How the storming of the U.S. Capitol unfolded on Jan. 6*, USA Today, Updated Feb. 9, 2021, available at https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022).

[4] *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554 (emphasis added).

demand that the politicians that we elect will uphold those rights, or **we will go after them**."[5]
- Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican lawmakers to challenge the election result and **"punch back from Donald Trump."**[6]
- Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees **to march on the Capitol to "stand up for this country and stand up for what's right."**[7]
- Donald Trump, Jr. narrated that "You have an opportunity today: **You can be a hero, or you can be a zero**. And the choice is yours but we are all watching."[8]
- Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "**trial by combat**."[9]

An hour later, former President Trump took the stage and implored attendees to "fight" for him, notably stating:

| | |
|---|---|
| **12 p.m.** | We will not let them silence your voices. . . **we're going to walk down to the Capitol**, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen.[10] |

---

[5]     *Id.* (emphasis added).

[6]     *Id.* (emphasis added).

[7]     *Id.* (emphasis added).

[8]     *Id.* (emphasis added).

[9]     *Id.* (emphasis added).

[10]     *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

**1:10 p.m.**          And we fight. **We fight like hell. And if you don't fight like hell**, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. **And we're going to the Capitol**, and we're going to try and give.[11]

By this time, his supporters started heading towards the Capitol and started fighting with the police.

**1:10 p.m.**          Supporters "begin grappling with police on the Capitol steps." [12]



**1:30 p.m.**          After Trump's speech, "supporters being marching toward the U.S. Capitol."[13]

---

[11]    *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial; see also Petras, *Timeline*, footnote 2 supra, https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022) (emphasis added).

[12]    Petras, *Timeline*, footnote 2 supra.
[13]    Shelly Tan, Youjin Shin and Danielle Rindler, *How one of America's ugliest days*

**2:11 p.m.**                    Photographs indicate that supporters moved past the
police lines on the west side of the Capitol and others
scale the walls.[14]

- **Thomas Baranyi did not breach the
perimeter or fight officers to get past the
perimeter lines.**



---

*unraveled inside and outside the Capitol*, The Washington Post,
https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/
(last accessed on Feb. 28, 2022).

[14]     Petras, *Timeline*, footnote 2 supra.

**<u>2:23 p.m.</u>**     Thomas Baranyi enters the Capitol through the Senate Wing doors.  He was not the first to enter.  By this time, at least 100, people entered through the open doors and windows for at least 10 minutes.



**<u>2:24 p.m.</u>**     Approximately, one minute later, Mr. Baranyi is in the Crypt with hundreds of others.

9

**2:28:00 p.m.**

Officers guarding the Memorial Door clashed with people in the front of the crowd.

**Mr. Baranyi was not in the front of the crowd and did not clash with officers.**



**2:28:48 p.m.**  Mr. Baranyi was further away from the front of the crowd. Several people walked through the Memorial Door.  At least two other individuals are directing the crowd, including Mr. Baranyi through the doorway and "up the stairs."



**2:28:40 p.m.**              While Mr. Baranyi is proceeding through the
                             Memorial Door, protestors are in the Statuary Hall
                             Connector confronting officers.  Notably, a woman
                             yells, "Tell Pelosi, we are coming for her." Mr. Baranyi
                             is still coming through the Memorial Door.  See
                             Government Exhibit C at minute 0:56:09 and screen
                             shot from Statuary Hall Connector footage below at
                             2:28:40 p.m.





**2:30 p.m.**             While the confrontation is going on above, Mr. Baranyi is in Statuary Hall with several others who are walking in the direction of the House Chamber.



**2:31:06 p.m.**          Mr. Baranyi is in the middle of the crowd where a woman and others had confronted officers in the Statuary Hall Connector.



**2:36 p.m.**[15]    Prior to the crowd moving past the officers in the Statuary Hall Connector, a man with a bullhorn states to the crowd that they will be able to move forward if everyone is calm and "commits no violence." See minute 1:02:24-1:02:40 of Government Exhibit C.



**2:36 p.m.**    A few moments later, the crowd is at the House Chamber Door and another man with a bullhorn states, "Everybody, listen to me…We need to remain calm now…Let's be peaceful." See minute 1:04:06 of Government Exhibit C.



---

[15]    This is an approximate time based on later events.

**2:38 p.m.**          Mr. Baranyi moves along with several others down the hall way towards the Speaker's Lobby. He is not at the front of the crowd.  He is not leading the crowd.



**2:39 p.m.**          Mr. Baranyi is not breaking the glass at the Speaker's Lobby and is not at the front of the crowd.



**2:40 p.m.**                    Mr. Baranyi moves up to the front to pull people back
and stop them from breaking the glass.  He appears to
be the only one attempting to diffuse the situation.







**2:40 p.m.**                    Mr. Baranyi see the gun and puts his left hand up to
                                indicate surrender so the officer does not shoot.

*Minute 0:00:21*
*Exhibit E*



**2:40 p.m.**                   Mr. Baranyi pushes another pushes another person
                                 back away from the door.

***Minute 0:00:23***
 ***Exhibit E***                 Unfortunately, at the same time, Ms. Babbitt is
                                 starting to go through the broken glass.



**2:41 p.m.**                   Immediately, thereafter, Ms. Babbitt was shot.  Mr.
                                 Baranyi went to assist her.  Officers told him to step
                                 aside.

                                 Mr. Baranyi and several others are directed to exit the
                                 building.

**<u>2:53 p.m.</u>**        Mr. Baranyi is seen on BWC footage directing others to "move back" and leave the building.







When Mr. Baranyi exited the Capitol, other individuals were talking about the shooting.  Mr. Baranyi expressed his outrage that she was shot right in front of him and he had her blood on his hand.[16]   He then gave an interview to a reporter. Identifying with the deceased victim, Mr. Baranyi stated:

> We were crawling through the window in there. We smashed the window out – we were crawling through the window and they shot her in the neck. The police, the Service, whatever they are – they shot her with a gun through the neck and she fell back into my hands and onto the floor. I don't know if she is dead.

See Gov't Exhibit F.  It is clear from the video footage that Mr. Baranyi did not crawl or smash any windows.  He also did not have any altercations with law enforcement.

---

[16]     This video is available at https://twitter.com/dancohen3000/status/1346915317407244298?s=20&t=aKaSxY-a0Pck48-5r1zbIA.

## LEGAL PRINCIPLES

Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1), is a class A misdemeanor, as defined by 18 U.S.C. § 3559(a)(6), because it carries a maximum incarceration period of one year.  The United States Sentencing Guidelines apply to class A misdemeanors and suggest that a sentence between zero and six months would be appropriate, based on zero criminal history points and a total offense level of 4.  The law states Mr. Baranyi is eligible for probation because this offense is a misdemeanor.  18 U.S.C. § 3561(c)(2).

## Sentencing Law

### 1.  History – From unfettered discretion to Guideline bound.

For 200 years, federal judges had wide discretion when it came to sentencing and could sentence how they saw fit and "there was virtually no appellate review of the trial judge's exercise of sentencing discretion."[17]  Former federal judge, Marvin E. Frankel was the "most influential critic[] of indeterminate federal sentencing" and in 1972, he published a "forceful …. indictment of the sentencing authority he himself exercised--powers which he described as 'almost wholly unchecked and sweeping' and which he found 'terrifying and intolerable for a society that professes devotion to the rule of law.'" [18]  Judge Frankel called for a "Commission on Sentencing" and the enactment of laws to make guidelines that would be

---

[17]     Kate Stith & Steve Y. Koh, *The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines*, 28 WAKE FOREST L. REV. 223, 225 (1993).

[18]     *Id.* at 228.

"binding" on federal judges. [19]   Congress answered Judge Frankel's call and in 1984
the Sentencing Commission was born.   For decades, the U.S. Sentencing
Guidelines were binding.

The era of binding guidelines ended seventeen years ago, when the Supreme
Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the
Guidelines effectively ***advisory***."   *United States v. Booker*, 543 U.S. 220, 245 (2005)
(emphasis added).   Under *Booker*, the "district courts, while not bound to apply the
Guidelines, must consult those Guidelines and take them into account when
sentencing."   *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)).   While holding that
district courts should still consider the Guideline calculations and ranges for
sentencing purposes, the Supreme Court in *Booker* held that courts must consider
<u>all</u> the purposes of sentencing set forth in 18 U.S.C. § 3553(a).   Overall, in light of
*Booker*, courts must treat the Guidelines as <u>one</u> among several of the sentencing
factors.

18 U.S.C. § 3553(a) provides that the Court must consider:

> (1) the nature and circumstances of the offense and the history and
> characteristics of the defendant;
> (2) the need for the sentence imposed—
>> (A) to reflect the seriousness of the offense, to
>> promote respect for the law, and to provide just
>> punishment for the offense;
>> (B) to afford adequate deterrence to criminal
>> conduct;
>> (C) to protect the public from further crimes of the
>> defendant; and
>> (D) to provide the defendant with the needed
>> educational and vocational training, medical

---

[19]      *Id.*

> care, or other correctional treatment in the most
> effective manner

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines— (i)issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; …

(5) any pertinent policy statement— …

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).  In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. 18 U.S.C. § 3661.

23

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. § 3582(a) (emphasis added).  With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]."  *Id*. § 3553(a) (emphasis added).

## 2.  The Sentencing Guidelines are *only one factor*, thus Courts must not anchor themselves to the Guidelines.

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors. *See Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007).  A sentencing court shall not simply presume that a sentence within the Guideline range is automatically reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. *Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 46. The sentencing court further shall not presume that a sentence outside of the Guidelines range is unreasonable.  *Id.*  By considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal

24

sentencing procedure." *Rita*, 551 U.S. at 351.

It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); s*ee also United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *4-5 (D. Md. Feb. 18, 2020)("But if judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for.").

Overall, judges are encouraged to resist "anchoring" the sentence on the guideline numbers. "Anchoring is a cognitive bias that describes the human tendency to adjust judgments or assessments higher or lower based on previously disclosed external information - the 'anchor.' Studies demonstrate 'that decisionmakers tend to focus their attention on the anchor value and to adjust insufficiently to account for new information.'" Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" and "Blind Sot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw*, 104 J. Crim. L. & Criminology 489, 495 (2014) (citations omitted).

It is important to distinguish the guidelines' intended, salutary effect - promoting consistency and proportionality in sentencing - from the

> unintended anchoring effect that the guidelines can exert. …
> Anchoring leads to cognitive error not insofar as judges intentionally
> use the guidelines in an advisory fashion, but instead when judges
> irrationally assign too much weight to the guidelines range, just
> because it offers some initial numbers.

*Id.* at 524 (inner quotation marks and citation omitted); *see also United States v.*

*Docampo*, 573 F.3d 1091, 1105 n.5 (11th Cir. 2009) (Barkett, J., concurring and

dissenting) ("Not only have district courts now become used to relying on [the

Guidelines], but the Guidelines inevitably have a considerable anchoring effect on a

district court's analysis").

## ARGUMENT

Mr. Baranyi is a 30-year-old college-educated former Peace Corp volunteer.

While the nature and circumstances of the January 6th events were indeed serious,

his particular actions that day, paired with his individual history and

characteristics do not lend itself to a sentence of incarceration. Rather, a sentence

of probation and restitution would meet the purposes of sentencing, without being

overly punitive.

## I.  Nature and Circumstances of Mr. Baranyi's Offense

The events of January 6th are seared into the nation's memory. That day and

the days after resulted in lost lives and over 1 million dollars in property damage.

In addition, it caused trauma to politicians and staffers and their family members

who were present there and who watched from a far.

Mr. Baranyi understands and would never minimize the impact of the event

on the nation. However, his actions have to be judged individually. He was not the

cause of January 6th, nor was he in the category of people who caused physical harm to others or damage to the Capitol buildings.  Instead, he sought to diffuse a tense clash between protestors and police.  He entered the building unlawfully.  However, as laid out in detail above, he did not lead any groups of individuals or clash with police.  His unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day.  Various factors led to the Capitol being breached, including "paralysis" "exacerbated by the patchwork nature of security across a city where responsibilities are split between local and federal authorities" and "driven by unique breakdowns inside each law enforcement agency."[20]  To characterize Mr. Baranyi as the proximate cause of the January 6th event fails to acknowledge these other failures, and places an unjust blame on one non-violent, non-destructive individual.  The American system of justice, and specifically 18 U.S.C. § 3553(a), directs this Honorable Court to look at every defendant and every defendant's actions individually.  *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

Mr. Baranyi traveled alone to the Capitol.  He attended the rally alone and found commonality with several others in attendance.  He regretfully went along with the crowd.  After the shooting he provided the video footage to a local reporter.

---

[20]      *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*, The Washington Post (Oct. 31, 2021), available at
https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

On January 7th, he texted the reporter not to share it and he made an error sharing the video:





Mr. Baranyi does not justify his conduct.  He recognized that he should not have entered the Capitol.  He regrets believing the propaganda about a stolen election.  He blames himself for not doing more to save Ms. Babbitt.

## II.   **Mr. Baranyi's History and Characteristics**

Thomas Baranyi had an unstable childhood.  His parents divorced during his teen years.  His father was verbally and physically abusive during his childhood and an alcoholic.  They have not spoken in years.  As a result of witnessing his father's alcohol abuse, Mr. Baranyi has never consumed alcohol or illicit substances.

Mr. Baranyi graduated from college in 2017.  From 2018 to 2020, he served in the U.S. Peace Corps in Albania as an English teacher.  Seeking to fulfill his passion for service, Mr. Baranyi enlisted in the U.S. Marine Corps from July 2020 to September 2020, when he was honorably discharged for a medical reason.

After witnessing Ms. Babbitt's death, Mr. Baranyi wished he could have done more.  He decided to train as an Emergency Medical Technician and he obtained his EMT certification.  Unfortunately, because of January 6th, he has not been able to obtain a job as an EMT.  Not to be deterred from his desire to serve, Mr. Baranyi volunteers his time to different organizations, including training applicants for the Marine Corps.   He had been employed at a local gym and was recently laid off.

His desire to serve and help others is consistent with how his friends describe him.  Mr. Baranyi's former boss describes him as a "huge asset to [the] team and th[e] company" and as an employee who "made [the manager's] job easier."[21]  He has "been a pillar in Mercer County," who "[v]olunteers at the Marine cor[p] and helps future Marines study and pass the[ir] ASVAB testing" and he is a person of "stand-up character."

His Peace Corps colleague states that Mr. Baranyi "has always been polite, patient, and available all the time."[22]  Highlighting his intellect and positive approach to life, she states, "I think all people should be like Thomas, who thinks with his head, and believes in ideals and principles."

A friend and patron at the gym states that Mr. Baranyi "is determined and passionate when it comes to making a positive influence in the world."[23] Similarly, his friend of five years describes him as "a good person and hard working."[24] Another friend explained that Mr. Baranyi treated him a like brother, while others

---

[21]    Exhibit 1, Letter from Employer.
[22]    Exhibit 2, Letter from Colleague, A. Tufa
[23]    Exhibit 3, Letter from Friend
[24]    Exhibit 4, Letter from Friend Matthews.

treated him differently because of his disability.[25]  Overall, he is described as an

upstanding, compassionate, and sincere person.


### III.   A Probationary Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for

the sentence imposed— . . . to reflect the seriousness of the offense, to promote

respect for the law, and to provide just punishment for the offense."  Incarceration is

not required in order for a sentence to reflect the seriousness of the offense.  "A

sentence of probation rather than incarceration can work to promote the sentencing

goal of respect for the law by illustrating a rejection of the view that the law is

merely a means to dispense harsh punishment without taking into account the real

conduct and circumstances involved in sentencing."  *United States v. Bennett*, No.

8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing

*Gall*, 552 U.S. at 99).

To determine a just punishment for Mr. Baranyi, the Court must consider the

conditions under which an individual will serve time if the Court decides to

incarcerate the individual.  Since the beginning of the COVID-19 pandemic, the

virus spread rampantly in detention facilities.  Thousands of BOP inmates have

tested positive for COVID-19 and the latest BOP numbers show that 271 inmates

---

[25]     Exhibit 5, Letter from M. Breckenridge.

have died from COVID-19.[26]   With the rise of COVID-19 variants, the risks of

contracting the virus and death remain a serious concern for inmates.

### IV.   A Probationary Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from the Unlikely Chance of Further Crimes of Mr. Baranyi.

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider

"the need for the sentence imposed—. . . to afford adequate deterrence to criminal

conduct...[and] to protect the public from further crimes of the defendant."  The

national attention of this case as well as the unique circumstance of witnessing Ms.

Babbitt's shooting are deterrents for Mr. Baranyi.  He has no criminal history and

no indication that he would commit any future crimes.  Furthermore, the public has

been protected while Mr. Baranyi has been on pretrial release.  The public will be

protected while Mr. Baranyi is being supervised by the Probation Officer, which will

further deter any criminal conduct.

While "[p]rison is an important option for incapacitating and punishing those

who commit crimes," evidence suggests that lengthy prison sentences do not have a

"chastening" effect and "produce at best a very modest deterrent effect."  *Five*

*Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016).

With respect to specific deterrence, research shows conclusively that "[t]he *certainty*

of being caught is a vastly more powerful deterrent than the punishment," that

"[s]ending an individual convicted of a crime to prison isn't a very effective way to

---

[26] *See* Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last
accessed December 8, 2021).

deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect.  Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions.").  No incarceration is needed to deter criminal conduct in this case.

## V.   Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity

Sentencing Mr. Baranyi to probation would not contribute to an unwarranted sentencing disparity.  Approximately 188 defendants have been sentenced in these cases.[27]  More than 90% of the cases have been resolved as misdemeanor offenses. Of the misdemeanors cases, more than half have been sentenced to probation or home detention as a condition of probation.  January 6th defendants in other cases who pled to the *exact* same federal charge received probationary sentences.  *See United States v. Rachel Pert*, Crim. No. 21-cr-00139 (sentenced to 24 months' probation); *United States v. Jeffrey Witcher*, Crim. No. 21-cr-00235 (12 months' probation); *United States v. Nicholes Lentz*, Crim. No. 21-cr-00053 (1 month home detention and 36 months' probation).

The government cites several cases to justify its requested sentence, including the case of *United States v. Blake Reed*, 21-cr-204-BAH.  Both cases are very different.  Mr. Reed discussed joining the Proud Boys.  Reed, 21-cr-204, Gov't

---

[27]     This estimate is based on the government's chart, filed at ECF No. 51-1.

Sent. Memo, ECF No. 171, p.2.  Mr. Baranyi did not.  Reed posted a video of the crowd marching toward the Capitol which included the threat "we are coming for you."  Id.  Reed brought and used protective gear to the Capitol.  Mr. Baranyi did not.  Reed encouraged his co-defendant to remove evidence.  Mr. Baranyi did not.  Reed took steps to conceal electronic evidence on his phone.  Mr. Baranyi did not.  Reed appears to have mocked law enforcement after the execution of the search warrant.  Id. at p. 25.  Mr. Baranyi did not.  The most distinguishing feature between Reed and this case is that Mr. Baranyi tried to diffuse the tense standoff between an armed officer and protestors at the Speaker's Lobby.  There is no indication that Reed that did the same.

The government also cites to *United States v. Schornak*, 21-cr-278-BAH.  In that case, Schornak "traveled to the Visitor's Center and stole an American flag."  *Schornak*, 21-cr-278, Gov't Sent. Memo, ECF 62, p. 11.  Mr. Baranyi did not steal anything.  Schornak boasted about stealing the flag and causing tyranny inside the Capitol and he was "damn proud of it."  Id. at 16.  Mr. Baranyi did not boast about anything.  Rather, in his traumatized state, Mr. Baranyi expressed outrage in seeing Ms. Babbitt being shot.  He later expressed remorse that share the video, which he did in an effort to make the public aware of what happened inside.  He did not boast or brag about his presence or conduct inside the Capitol.

Another case where an individual boasted and was proud of his conduct inside the Capitol is the case of Adam Johnson. *United States v. Adam Johnson*, 21-cr-648 (RBW).  In that case, Johnson not only took Nancy Pelosi's lectern, he

proudly displayed the lectern and posed for pictures with it.  By contrast, Mr. Baranyi did not take memorabilia or take anything from members of Congress.

The government places great emphasis on Mr. Baranyi being in the crowd when other individuals were arguing with the police.  However, as noted in great detail above, Mr. Baranyi was not in the front of the crowd and at times appears to show up later after verbal and physical clashes have taken place with the police. The sentencing laws require this Honorable Court to sentence Mr. Baranyi based on his actions, not the actions of others.

As stated above, he regrets going to the Capitol and lending his voice to a falsehood about a fraudulent election.  He has lived every day since, wishing that he could have done more to stop Ms. Babbitt from being shot.  He has received more than one death threat and has tried to do what he can to be a contributing member of society despite his actions and perceived failures that day.  The government's requested sentence is greater necessary in light of the unique circumstances of this case.

## **<u>Conclusion</u>**

Considering the § 3553(a) sentencing factors, a probationary sentence with a condition of home detention, and restitution in the amount of $500, is a sufficient, but not greater than necessary, sentence to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Ubong E. Akpan
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500